(43) on
ORIGINAL
8/8/01

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JERRY MASON, | : | |
| *Petitioner* | : | Civil No. 1:00-CV-1490 |
| | : | |
| v. | : | (Judge Rambo) |
| | : | |
| ROBERT W. MEYERS, | : | (Magistrate Judge Smyser) |
| Superintendent, | : | |
| *Respondent* | : | |

**FILED**
**HARRISBURG**

AUG 7 2001

MARY E. D'ANDREA, CLER
Per
DEPUTY CLERK

## EXHIBITS TO BRIEF IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

AND NOW comes the petitioner, Jerry Mason, by his attorney Daniel I.

Siegel of the Federal Public Defender's Office, and files these Exhibits to Brief in

Support of Petition for Writ of Habeas Corpus.

Respectfully submitted,

Date: Aug. 7, 2001

Daniel I. Siegel, Esquire
Asst. Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Attorney for Jerry Mason
Attorney ID # 38910

# EXHIBIT - 1

D171

IN THE COURT OF COMMON PLEAS
OF LUZERNE COUNTY
PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,  :  CRIMINAL ACTION
        Plaintiff,

                      :

        vs.

                      :

JERRY MASON,
        Defendant.    :  No. 2015 of 1987

TRANSCRIPT OF PROCEEDINGS

BEFORE:

THE HONORABLE GIFFORD S. CAPPELLINI, J.
Luzerne County Courthouse
Courtroom Number 6
200 North River Street
Wilkes-Barre, Pennsylvania 18711-1001
Wednesday, August 11, 1993, Commencing at 10:00 a.m.

APPEARANCES:

MARY ANN MCGRANE, ESQ.
On behalf of the Commonwealth

DEMETRIUS W. FANNICK, ESQ., Conflict Counsel
On behalf of the Defendant

93 AUG 23 PM 2:41

LUZERNE COUNTY
CRIMINAL DIVISION
CLERK OF COURT

3

1    THE COURT:    Ready to proceed?

2    MR. FANNICK:    Yes, we are, Your Honor.

3    MS. McGRANE:    Commonwealth versus Jerry Mason.

4    Case number 2015 of 1987.  We're here on a petition for

5    Post-conviction Collateral Relief hearing.

6    MR. FANNICK:    Perhaps by way of background, for

7    the record, Mr. Mason filed his PCCR petition during May

8    of this year.  Filed to information number 2015 of 1987.

9    It was filed pro se.

10    When the Court reviewed the petition, I was

11    appointed in my capacity as conflict counsel to represen

12    Mr. Mason relative to these proceedings.  The hearing wa

13    originally scheduled for June 17th.  It was continued

14    because of some confusion on my part.  It was reschedule

15    at my request by the Court to today's date.

16    Procedurally, Mr. Mason was convicted following a

17    jury trial during March 1988 of rape, kidnapping and

18    other related charges.  He was sentenced on November 8th

19    1989, basically, to a combined sentence of 14 years to 2

20    years.

21    The PCCRA petition, as I said, was filed by Mr.

22    Mason, and that's the reason we're here.  It appears to

23    summarize the petition, before we proceed with testimony

24    from Mr. Mason, that there are basically two, perhaps

25    three, areas that he would like raised at these

4

1    proceedings.  First has to deal with whether or not

2    there was proper investigation done by his attorneys or

3    investigators.  And he will address that issue through

4    his testimony.  Secondly, which perhaps is related to the

5    first, is whether or not he was provided effective

6    assistance of counsel.  And I believe the major area

7    there, as will be developed through the testimony, is

8    that there was -- he's alleging there was a conflict of

9    interest between Mr. Marsilio and Attorney Murtha, in

10   that they had at one time worked for both the public

11   defender and the district attorney offices.  Lastly, Your

12   Honor, and I'm not sure if the Court will consider this

13   type of evidence in this type of proceeding, but Mr.

14   Mason is prepared to testify, perhaps will address it

15   during the course of the testimony, as to events which

16   would shed light on his character and would basically

17   have been issues had any type of sentencing proceeding or

18   modification proceeding, which he had both, but events

19   and situations which he has done and accomplished since

20   being sentenced and since being incarcerated.  There are,

21   I believe, witnesses who would also offer testimony to

22   that effect.  In order to proceed with that type of

23   testimony, I believe I would have to move to perhaps

24   amend the PCCRA petition by way of -- it's almost a

25   motion to modify a sentence nunc pro tunc.  And, again,

1    we will attempt, through testimony, to offer that type of

2    evidence and the Court will have to rule on that at that

3    time.

4         With that in mind, Your Honor I would call Mr.

5    Mason as a witness.

6                        - - -

7    JERRY MASON, called as a witness, being duly sworn,

8    testified as follows:

9                        - - -

10   DIRECT EXAMINATION

11   BY MR. FANNICK:

12        Q    Mr. Mason, would you state your name and age for the

13   record.

14   A    Jerry Mason.  38.

15        Q    And you are the petitioner in the PCCRA petition

16   which we are now proceeding on?

17   A    Yes.

18        Q    And where are you presently incarcerated?

19   A    Rockview State Prison.

20        Q    And how long have you been incarcerated?

21   A    Almost six years now.

22        Q    You alleged in the petition one area, which I've

23   already represented to the Court, regarding the alleged lack

24   of investigative work done by counsel or investigators

25   relative to your defense.  And I want to confine this for

1    simplicity reasons to two specific areas:  That being a time

2    frame stemming from the time of your arrest, or the date that

3    you were first appointed counsel, up until the time that the

4    trial began as being the first frame of reference.  And then

5    the time period from when the trial commenced until the

6    sentencing modification was over as the second time frame.

7    And as far as this first time frame is concerned, and that is

8    the pretrial stages of the proceeding, I would ask you to

9    specify for the record whether or not any requests were made,

10   and to identify who they were made to, whether they be your

11   lawyer or an investigator directly, regarding any fact witness

12   or issue regarding this case.

13   A    Okay.  Shortly after I was arrested I was still in the

14   county prison.  I had spoken to Thomas Marsilio, he was my

15   attorney at that time, and I asked if he had an investigator

16   and he said, "yes, I did."  And I don't remember his name.  It

17   was the investigator from the Public Defender's Office.  And I

18   had asked if he would go to a certain address and please check

19   with that individual as to my whereabouts that night.  And

20   also, if you could --

21        Q    Let's take them one at a time for simplicity

22   reasons.  Did you specify to Mr. Marsilio the particular

23   identity of the individual and the particular address that you

24   wanted investigated?

25   A    Yes, I did.

1     Q     Could you tell us that name and that address?

2  A     That was Timmy Reilly and it was Berwick Street, White

3  Haven.

4     Q     And the purpose for that was you considered that a

5  potential alibi defense for these charges?

6  A     Yes.

7     Q     And was that also told to Mr. Marsilio?

8  A     Yes.

9     Q     Regarding that particular request, do you know or

10  were you told whether or not Mr. Reilly was ever contacted?

11  A     Yes.  During the trial they said that the investigator

12  had testified that he had contact with him.  But he had

13  contact with that home and was speaking to his mother.  And

14  during that conversation he talked to his mother about

15  something else concerning her son and had forgotten to talk to

16  him concerning my case.  And they hung up the phone and he was

17  never able to get in touch with him again.

18     Q     Do you know if there were any other efforts, other

19  than that one contact, to locate Mr. Reilly?

20  A     Yes.  Judge Cappellini ordered the District Attorney's

21  Office to subpoena him over the weekend and he was unable --

22  on a short notice -- to contact him.  He works away.  He works

23  out on the interstates and he wasn't at home at that

24  particular time.

25     Q     Were there any other issues or facts or witnesses

1   which you asked your attorneys or the investigators to

2   investigate?

3   A    Yes.  To see if they could retrace the steps that was

4   given to the state police where this incident was supposed to

5   have happened that night to see if they could find the

6   location.  And that was never done at all as far as I know.

7        Q    Anything else?

8   A    No, that was it.

9        Q    Now, getting into the second area, then, or second

10  time frame, that being either during the course of trial or

11  following the trial as far as obtaining or interviewing any

12  particular witnesses to present to the Court during the

13  sentencing proceeding, who was representing you at that time?

14  A    During sentencing?

15       Q    Well, first of all, during the trial it was Mr.

16  Marsilio?

17  A    Mr. Marsilio represented me first.

18       Q    And during the sentencing, the post-verdict and

19  sentencing proceedings?

20  A    Well, post-verdict it was Virginia Murtha, which she had

21  originally prosecuted me through the preliminary hearing and

22  so forth.  And then Mr. Marsilio had gone -- before sentencin

23  he had gone to the District Attorney's Office and Virginia

24  Murtha had gone from the District Attorney's Office to the

25  Public Defenders' Office and had become my attorney.

1      Q    We'll get into that issue in a few minutes.  My

2  question is:  Was there anything that you had asked any of

3  your counsel to do by way of investigating any fact or

4  obtaining any witnesses to either present in your defense at

5  trial, other than Mr. Reilly, or at the sentencing proceeding,

6  by way of offering any type of mitigating evidence or

7  circumstances through a witness to Judge Cappellini?

8  A    No.  I don't think I understand your question.

9      Q    Did you ask any of your attorneys or any

10 investigator to produce anyone or investigate anything that

11 you wanted presented either during trial or to the Judge at

12 the sentencing proceeding?

13 A    No.

14     Q    So there is no confusion, your claim then in this

15 petition as far as the investigation is concerned, would

16 center around Mr. Reilly and around the request to locate the

17 crime scene?

18 A    Yeah.  Well, I wanted the issue addressed of Virginia

19 Murtha; I wanted that addressed at my sentencing.

20     Q    I understand that.  Right now I'm just dealing with

21 the claim as far as the faulty investigative work.  So that

22 issue can be defined to those two areas?

23 A    Right.

24     Q    Now as far as the conflict of interest or

25 effectiveness of counsel claim, who was originally assigned to

1   represent you at the preliminary hearing in this matter?

2   A    Virginia Murtha.

3        Q    To represent you?

4   A    That was Thomas Marsilio.

5        Q    And did you appear at the preliminary hearing?

6   A    Yes.

7        Q    And was there in fact a preliminary hearing?

8   A    Yes.

9        Q    Do you recall who represented the Commonwealth, or

10  the prosecution, at the preliminary hearing?

11  A    That was Virginia Murtha.

12       Q    At the time of trial, you were continued to be

13  represented by Mr. Marsilio?

14  A    Yes, I was.

15       Q    And following trial, did there come a point in time

16  when Mr. Marsilio ceased being your attorney and someone else

17  was appointed?

18  A    Yes.  Right after the trial he was assigned to the

19  District Attorney's Office.

20            THE COURT:    Just hold on one second.

21       Q    And who was appointed to represent you at that time

22  when Mr. Marsilio left?

23  A    Virginia Murtha.

24       Q    And this was the same attorney who had represented

25  the Commonwealth at the preliminary hearing?

1    A    Yes.

2        Q    At any time when she was first appointed to

3    represent you, did you object either to her or anyone as far

4    as her representation?

5    A    Yes.

6        Q    To whom did you object?

7    A    I objected to her and she said it was all right.  And I

8    wrote Judge Hourigan, at the time, and asked him, I said I

9    didn't understand what was going on there.  And asked him if

10   he felt if that was fair.  And he wrote -- he didn't write

11   back but he set up a hearing.  And he said it wasn't fair and

12   he had taken her off my case and assigned Joseph Vullo, the

13   conflict counsel, to my case.

14       Q    Do you know approximately how long Virginia Murtha

15   represented you?

16   A    Probably around three or four months.  Maybe even a

17   little bit longer.

18       Q    During the time that she represented you, did she

19   appear with you at any proceedings?

20   A    In another case, yes.

21       Q    At any proceedings regarding this case?

22   A    No.

23       Q    Did she do anything on your behalf regarding this

24   case?

25   A    Yeah, she wrote up my appeals.

1      Q      When you say that she wrote up your appeals, do you

2   mean that she filed the actual post-verdict motions for you?

3   A      Yes.

4      Q      Did she submit a written brief in support of those?

5   A      Yes, she did.  What she did is she wrote -- drew up the

6   appeals and she didn't submit them to the court.  But what

7   happened is Joseph Vullo became my attorney, she handed him

8   the appeals and said that they're already done.  He in turn

9   filed them with the courts.  It was within a couple day

10  period.

11     Q      Other than what you perceive to be the appearance of

12  impropriety or conflict with having Attorney Murtha represent

13  you when she had been a member of the District Attorney's

14  Office and had in fact appeared on the DA's behalf at the

15  preliminary hearing against you, was there anything that was

16  either told to you directly by her or anything that you later

17  found out which gives rise to more than that appearance of a

18  conflict?  In other words, did she at any time say anything to

19  you which you found to be not in your best interest in

20  representing you?

21  A      Not to me directly.  But at the preliminary hearing she

22  had made comments concerning me and my character, whatever you

23  want to call it, that would show that she in fact had

24  developed an opinion that I was guilty.  And I don't see how

25  she could have changed something like that after believing

1    that at one time and then in a couple months change it back

2    and say -- you know.  So from the preliminary hearing on I

3    would believe that she felt I was guilty, just by comments.

4         Q    Did you attempt at all to address that issue

5    directly with her or did you simply go through the motion

6    which you filed with then President Judge Hourigan?

7    A    No.  I had asked her and she said that she had no problem

8    with representing me.  She would never address the issue of

9    whether she felt I was guilty or innocent, she just said she

10   would have no problem.

11        Q    Now, is there anything further regarding that issue

12   of this alleged conflict which you would want to testify to

13   now or make the Court aware of?

14   A    I also felt there was some conflict in the District

15   Attorney's Office, as well, concerning me.  Immediately

16   following my sentencing the District Attorney had taken the

17   case from my mother's estate and is also working against me in

18   that case also which I haven't gotten anything as far as the

19   will.

20            MS. McGRANE:    Your Honor, I object to this.  I

21        don't think that proceeding has anything to do with this.

22            THE COURT:    No, that's overruled.

23        Q    When you say the District Attorney, who are we

24   referring to now?

25   A    William Keller.

MASON-DIRECT-FANNICK

1        THE COURT:     Who?

2   A    William Keller.

3        Q    And Mr. Keller was the prosecuting attorney at your

4   trial?

5   A    Right.

6        Q    And so that the record is clear, you're now saying

7   that after your conviction, Attorney Keller represented whom

8   A    The executor of my mother's estate in a civil matter.

9        Q    Were there any issues that you told Attorney Murtha

10  that you wanted raised in your post-verdict motions which we

11  not raised?

12  A    Yes.  I wanted some of the issues that we're raising

13  right now; I wanted them raised, including the conflict, and

14  that was never put in the brief.  I mean, I find it hard to

15  believe that she could prosecute and then defend -- you know

16  go against her prosecution, and I wanted that issue raised.

17  That was never put in the brief.  It was never addressed unt

18  now.

19       I also wanted the location of the incident, I wanted th

20  addressed.  I wanted the alibi witness, I wanted that

21  addressed also.  I had asked if that could be and they weren

22  addressed.

23       Q    Now, the third area which I know you want to

24  address, has to deal with your character or things that you

25  may have accomplished, and I believe, and correct me if I'm

1    wrong, since your time of incarceration, is that correct?

2    A    Yes.

3         MS. McGRANE:    Your Honor, I would object to that,

4    too.

5         THE COURT:    It's going to be sustained.  I don't

6    think it's appropriate here.  But I will tell you this,

7    I have letters from several people, I will consider them

8    in the overall picture, but not on the basis of what

9    we're discussing.  I do that on the basis that people

10   have taken their time to send these letters to me that I

11   have, and I have been over them.  And I'm not going to

12   ignore them, but they're not proper in this proceeding.

13   Your objection is sustained.

14   Q    Mr. Mason, is there anything else that you would

15   want to testify to today regarding the issues that have been

16   outlined to the Court?

17   A    Yes.  I had asked all along that the sentence that I was

18   given be addressed.  And I thought the sentence was lengthy.

19   And I'm not asking for the sentence to be taken away, I was

20   asking for mercy of the Court to lower that sentence to a

21   reasonable sentence where there's light -- you know, have some

22   kind of light in the tunnel here, and I could prepare for

23   society and programing, and so on and so forth, while I'm in

24   prison.

25   Q    Just one last question.

1              THE COURT:       Let's address that.  I don't want

2        him just hanging with that when he made that statement.

3        I think that that should be addressed.

4        Q    Other than evidence or testimony regarding events

5   that would have come after you were sentenced, which are not

6   relevant to this particular proceeding, is there any evidence

7   or was there any evidence, whether it goes to your character,

8   reputation or anything, that you may have accomplished in

9   life, which was not made available to Judge Cappellini either

10  at the time of your sentence or at the time of the

11  modification proceeding?

12  A   Yeah.  I don't feel my character was addressed in its

13  entirety at the time.

14             THE COURT:       Your what?  I didn't hear.

15  A   I don't feel that my character was addressed in its

16  entirety at the time.  I feel if it was, I believe I would

17  have gotten a sentence, but I believe it would have been

18  something a little bit more reasonable if everything had been

19  taken into consideration at the time.

20  Q    I believe I've asked you this before, but since

21  we're right on this issue, is there or was there any witnesses

22  or any records which you wanted counsel to present to the

23  Court on your behalf at the time of sentencing or at the time

24  of the modification which you made counsel aware of which was

25  not in fact produced?

 1  A    No.  Alibi witnesses -- not alibi witnesses, but

 2  character witnesses I had asked.  Military record I wanted

 3  that in there.  My standing as far as in society; I had owned

 4  a company that I built from nothing, I wanted those issues

 5  addressed and that character to be highlighted so the Judge

 6  could know who I was and what I had once done in society.  To

 7  show that I wasn't a threat to society or a future threat

 8  even.

 9          MR. FANNICK:    I have no other questions, Judge.

10          THE COURT:      You may not have other questions but

11      what was raised I think should be addressed on the basis

12      of the sentence.  And so that it's clear to you, I have

13      no jurisdiction over your sentence at this point so that

14      you understand that.  So when you're talking in terms of

15      the sentence that you consider to be unreasonable, I

16      cannot modify the sentence now at this point, so you

17      understand that.  Is there any question in anybody's

18      mind?

19          MR. FANNICK:    No, Your Honor.  And I will address

20      that with him following these proceedings as far as what

21      perhaps he can file with the Department of Corrections,

22      or parole board, governing early parole or whatever

23      issues would be raised.

24          THE COURT:      I just don't want him under the

25      impression that something can be done here, so that you

1    understand that.  And I think you're probably aware of

2    that, are you not?

3         DEFENDANT:    No, I wasn't.

4         THE COURT:    Well, you are now.

5                      - - -

6    CROSS-EXAMINATION

7    BY MS. McGRANE:

8         Q    Mr. Mason, Attorney Cowley spoke with you at length

9    regarding her representation of you, did she not?  Attorney

10   Murtha?

11   A    She had spoke to me over the prison, yes.

12        Q    And you indicated to her that you didn't have a

13   problem with her representing you, didn't you?

14   A    No, I indicated I did have a problem.

15        Q    Isn't it true that Attorney Cowley only filed a

16   brief in support of the motion for a new trial and in an

17   arrest of judgement, she didn't actually file the motion for

18   new trial in an arrest of judgement?

19   A    As far as -- the only copy I got was from Virginia Murth

20   and --

21        Q    For the brief?

22   A    Right, the brief.

23        Q    Mr. Marsilio filed the post-verdict motions?

24   A    I didn't see anything from Mr. Marsilio.  The only thin

25   I asked was Joseph Vullo if he would send me a copy of the

1   brief and that's what was filed.

2        Q    And as far as part of that brief, as part of the

3   brief in support of the motion for new trial, she covered the

4   area about whether the crime occurred in Luzerne County, isn'

5   that right?

6   A    Not in its entirety.  You could ask me a question but

7   unless you ask in its entirety, it isn't going anywhere.  But

8   I don't feel it was addressed properly.

9        Q    But it was addressed?

10  A    It doesn't matter how it was addressed, it wasn't

11  addressed properly.

12       Q    And Mr. Marsilio represented you from the time of

13  the preliminary hearing to the time post-verdict motions were

14  filed?

15  A    Until the time of the end of the trial, that was the las

16  time I had known.

17       Q    And Mr. Marsilio filed request for discovery, bill

18  of particulars, pretrial motions, an alibi --

19  A    You see, I've tried -- attempted through each attorney

20  for five and a half years now to obtain my transcripts so I

21  could be better prepared when I come before you right now for

22  your questions.  For five and a half years I've been unable t

23  get my transcripts from anyone.  And each attorney I've

24  written letters to and have asked personally for those

25  transcripts.  So I have no idea of any of the questions you'r

1    asking me.

2            MS. McGRANE:      Your Honor, may I approach the

3        witness and just show him a motion?

4            THE COURT:        Certainly.

5        Q    I'm showing you a motion.  It's a notice of an alibi

6    defense, and it's signed by Attorney Marsilio, is that right?

7    A    Uh-huh.

8        Q    Turn to the next page.  And Tom Reilly is listed on

9    that motion?

10   A    Uh-huh.

11       Q    Or Tim Reilly, I'm sorry.  And is that the man that

12   you spoke of previously?

13   A    Yeah.

14       Q    And you're not alleging that Mr. Marsilio had

15   anything to do with your case once you became a member of the

16   District Attorney's Office, are you?

17   A    I don't know.  See, they were -- I believe that they were

18   both working in the Public Defender's Office for a short time

19   there.  And, you know, I have no way of saying something like

20   that.

21       Q    So you had no knowledge that he worked on your case

22   when he was in the District Attorney's Office?

23   A    Yeah, I have no way to say.

24       Q    And in your petition you allege that there was a

25   failure of communication by your attorneys?

1    A    Right.

2         Q    Which attorneys would they have been?

3    A    Virginia Murtha, Thomas Marsilio and Joseph Vullo.

4         Q    Isn't it true that Attorney Marsilio accepted

5    collect calls from you from the prison?

6    A    Yes, he did.  I'm not saying he didn't talk to me, I'm

7    not saying that.  He did accept my collect phone calls.  I'm

8    saying I requested that something be done as far as the

9    investigation.  It was never done.  I believe if you check in

10   the trial transcripts you'll find that even on testimony from

11   the investigator, he failed to speak to those people that I

12   had asked him to speak with.  And also, retrace the steps of

13   that crime.

14        Q    And the only person you're referring to is Tim

15   Reilly?

16   A    Right.  Joseph Vullo also had -- from the White Haven

17   Police Department, one of the policemen had information

18   concerning the incident that night and the crime, and he trie

19   to get in touch with Joseph Vullo, and Joseph Vullo missed th

20   appointments.  The man drove up here and everything.  He work

21   in the comm. center now but he failed to get that information

22   off of him.  He had quite a bit of information that he wanted

23   to discuss with Joseph Vullo.

24        Q    Attorney Vullo represented you from May 17th of

25   1989?

1    A    Yeah.

2        Q    And he represented you at the time of sentencing?

3    A    Right.

4        Q    And could you tell the Court how your allegation

5    that your attorneys failed -- or the investigators failed to

6    retrace your steps of the police to locate the crime scene

7    prejudiced you?

8    A    Yes.  Well, I had hoped to find that crime scene they

9    would have been able to uncover evidence, offer some type of

10   proof as to my innocence.

11       Q    Are you aware of any evidence that would have been

12   found there?

13   A    No, that's why I wanted to find the spot.  And if they

14   could find the spot, they could find something, possibly, that

15   would possibly prove my innocence.  And it wasn't done at all.

16       Q    And you mentioned on direct examination that

17   Attorney Cowley represented the executor of your mother's

18   estate in a civil matter?

19   A    Right.

20       Q    Could you tell me how that affected or prejudiced

21   you in this case?

22   A    Well, my mother's estate had been opened since 1985, and

23   it just seemed kind of strange that after I was sentenced that

24   he would take the case.

25       Q    But that didn't have any effect on --

MASON-CROSS-McGRANE                                              23

1   A    Whether he had planned it that way, I have no idea.  I

2   can't say so.  I wouldn't even lead in that direction.  I just

3   thought the issue should be brought up.  I didn't feel it was

4   fair.  I didn't feel it was ethical.  But I couldn't make an

5   accusation, anything other than that.

6        Q    And just so we're clear, the only thing that

7   Attorney Cowley represented you on was the brief in support of

8   post-verdict motions, and right after that, Attorney Vullo was

9   appointed?

10  A    Right.

11       Q    And you made reference to evidence not available for

12  the sentencing, character evidence.  What exactly were you

13  referring to?

14  A    Well, when they had come over to get the PC -- or the

15  pre-sentence report from me, I had mentioned things in there,

16  just like my attorney there, that I wanted addressed.  And

17  character witnesses.  And that's not going to do any good.

18  It's not necessary for them to be there.  And no one had come

19  to my sentencing.  I was there alone.  There was nothing there

20  to address my character.

21            MS. McGRANE:    I have nothing further, Your Honor.

22            MR. FANNICK:    No redirect, Your Honor.

23            DEFENDANT:    Could I just say one thing?  Talked

24       a minute ago about the White Haven Police Department,

25       one of the officers had information.

MASON-CROSS-McGRANE                                                    24

1          MS. McGRANE:    Your Honor?

2          DEFENDANT:    Speak with Joseph Vullo and Joseph

3     Vullo made an appointment, failed to show for the

4     appointment.

5          THE COURT:    You just said that before.

6          DEFENDANT:    I just wanted to make sure that was

7     clear.

8          THE COURT:    You already said that.  No, wait.  I

9     don't know if we're finished yet.

10         MR. FANNICK:    No redirect.

11         THE COURT:    Fine.  You may step down.  Watch

12    your step getting down.

13         MR. FANNICK:    If I could have just one minute,

14    Your Honor.

15         THE COURT:    Take your time.

16         MR. FANNICK:    No further testimony, Your Honor.

17         THE COURT:    Anything from the Commonwealth?

18         MS. McGRANE:    The Commonwealth would call Mr.

19    Marsilio.

20                        - - -

21    THOMAS MARSILIO, called as a witness on behalf of the

22    Commonwealth, being duly sworn, testified as follows:

23                        - - -

24    DIRECT EXAMINATION

25    BY MS. McGRANE:

1    Q    Mr. Marsilio, you represented the Defendant, Jerry

2  Mason, from the time of the preliminary hearing through

3  post-verdict motions, is that right?

4  A    That's correct.  I, in fact, filed the post-verdict

5  motions, which I dictated shortly after the verdict was

6  rendered.

7    Q    Mr. Mason claims that no investigation work was done

8  on his behalf, particularly regarding Tim Reilly.  Would you

9  address that?

10  A    The notice of alibi defense includes two individuals, Tim

11  Reilly being one and Mike Rasavage being the other.

12         MR. FANNICK:    I object to anything regarding Mr.

13     Rasavage, Your Honor.  It's beyond the scope.

14         THE COURT:    I think that's correct.  We're just

15     talking about Mr. Reilly.  He didn't raise the other one,

16     so we're not going to get into the other.

17         DEFENDANT:    The point I was making, Judge, was

18     that --

19         MR. FANNICK:    Objection, Your Honor.

20         THE COURT:    Your objection is sustained.

21  A    Could you repeat the question.

22    Q    What investigation work was done on behalf of Mr.

23  Mason?

24  A    The investigators assigned to the case from the Public

25  Defender's Office was one Russ Thomas.  I don't recall if Mr.

1  Thomas spoke to Mr. Reilly directly.  I spoke to Mr. Reilly's

2  mother, Margaret Reilly, who is a member of White Haven

3  Borough Council and she indicated to me --

4         MR. FANNICK:    Objection.  Hearsay.  Plus it's not

5    relevant what his mother may have said, Your Honor.

6         THE COURT:    Your question now is different from

7    the other one, as I understood.  I think your question

8    that you asked him now is, what investigation was done?

9         MS. McGRANE:    That's correct.

10        THE COURT:    But can't have hearsay.  You can

11   pursue whatever you did.

12 A    As a result of my discussions with Mrs. Reilly, it

13 appeared to me as though Timothy Reilly would be of no help to

14 us as far as his testimony was concerned.

15        Q    Mr. Marsilio, when did you leave the Public

16 Defender's Office?

17 A    I joined the District Attorney's Office May the 24th of

18 1988.

19        Q    Once you began working in the District Attorney's

20 Office, did you have any involvement in the case against Jerry

21 Mason?

22 A    Absolutely none whatsoever.

23        Q    And then Attorney Joe Vullo was appointed to

24 represent Mr. Mason?

25 A    I don't recall what the order was.  I thought that

1   Virginia Cowley was appointed next.  I don't remember.

2        Q    Just one more question.  On the investigation, Mr.

3   Mason brought up a failure to go to the scene of the rape.

4   Could you address his discussions with you regarding that?

5   A    Truthfully, I don't recall that he and I ever discussed

6   that.  And the state police themselves, who investigated this

7   crime, didn't know --

8            MR. FANNICK:    Objection.

9   A    -- the scene of the alleged crime.

10           THE COURT:     What's your objection?  On the basis

11       of what they told him or on the information he gathered?

12           MR. FANNICK:    On the basis of what they told him.

13           THE COURT:     Whatever they told him would be

14       sustained, but in the investigation whatever he gathered

15       is not.  He can testify as to what he gathered.

16   A    Again, truthfully, I don't recall discussing that with

17   the Defendant.  And there was nothing that I did, and I don't

18   know if there was anything that Mr. Thomas did, in order to

19   locate the scene of the crime.

20       Q    Mr. Mason claims in his petition that you failed to

21   communicate with him.  Could you tell --

22   A    Well, I think during his testimony he indicated that

23   oftentimes I would accept collect calls from him at the

24   prison.  I also visited him on numerous occasions at the

25   Luzerne County Correctional Facility.

1          MS. McGRANE:    Your Honor, I offer the witness for

2     cross-examination.

3                        - - -

4     CROSS-EXAMINATION

5     BY MR. FANNICK:

6          Q    Mr. Marsilio, your client at the time, Mr. Mason,

7     during sometime prior to December 11th, 1987, told you that he

8     was not responsible for this crime, and that he had an alibi

9     witness by the name of Tim Reilly, isn't that true?

10    A    In addition to the other alibi witness, Mike Rasavage.

11         Q    And pursuant to those representations made to you,

12    you filed the notice of alibi defense on December 11th, 1987?

13    A    The document is there.  I don't know what the date is.

14         Q    And you listed on that document the name of Tim

15    Reilly as a potential alibi witness, correct?

16    A    Yes.

17         Q    Between December 11th, 1987, the date that document

18    was filed, and March 28th, 1988, the time the trial started,

19    for approximately four months, did you at any time personally

20    speak with Mr. Tim Reilly?

21    A    No, I did not.  I was unable to contact him.

22         Q    Approximately how many efforts did you make to

23    contact -- you personally make to contact Mr. Tim Reilly?

24    A    Truthfully, I don't remember.  I would recall that it may

25    have been a couple of times.  I think he was working out of

1  state at the time.

2      Q    Did you have the whereabouts not only of his

3  residence, but where he was working?

4  A    No, only his residence.

5      Q    You made a reference that you believed he was

6  working out of state at the time.  Do you have any

7  recollection as to where he was working?

8  A    No.

9      Q    During this four month time period, did you instruct

10  any investigator from your office to locate and speak with Mr.

11  Tim Reilly personally?

12  A    I don't remember specifically, but I think that Russ

13  Thomas may have been given that responsibility.

14      Q    And were you told any time during this four month

15  period by Mr. Thomas, or any other investigator in the Public

16  Defender's Office, that they had made efforts to personally

17  speak with Mr. Reilly and that they were unsuccessful?

18  A    I don't remember.

19      Q    When you began your trial in March of 1988, at that

20  time did you intend to call Mr. Reilly as a witness on Mr.

21  Mason's behalf?

22  A    To the best of my recollection, based upon what I was

23  told, I didn't think it would have been fruitful to call Mr.

24  Reilly.

25      Q    Did you discuss with Mr. Mason whether or not Mr.

1   Mason wanted Mr. Reilly subpoenaed to testify on his behalf at

2   trial?

3   A    I don't remember.

4        Q    At any time during the trial, or in preparation for

5   the trial, did Mr. Mason inquire regarding your efforts to

6   interview Mr. Reilly?

7   A    I don't remember.

8        Q    At any time during the trial, did Mr. Mason make any

9   request to you regarding the whereabouts of Mr. Reilly?

10  A    I don't remember that he did.

11       Q    Since you were unable to personally speak with Mr.

12  Reilly, an individual which the Defendant told you was an

13  alibi witness, did you at any time request the court, prior to

14  or during trial, for a continuance so that you could locate or

15  attempt to locate and interview Mr. Reilly?

16  A    No, I didn't, because I felt that I had Mr. Rasavage to

17  testify on Mr. Mason's behalf.

18       Q    And was this strategy of using one witness instead

19  of two, or one instead of the other, discussed between you and

20  Mr. Mason?

21  A    I don't remember if it was specifically.

22       Q    During any time you were involved in this case, did

23  you personally examine any area which was identified as the

24  crime scene?

25  A    The only area that I examined was the mall in White

1  Haven.  The strip mall in White Haven where the crime

2  allegedly commenced.

3      Q    Was there any requests through discovery, pretrial

4  motion or otherwise, by you in your capacity as Mr. Mason's

5  defense attorney to the District Attorney's Office regarding

6  the exact whereabouts of the crime scene?

7  A    I'd have to review the pretrial discovery motions that I

8  filed because I don't recollect that right now.

9      Q    Do you recall making any oral request or having any

10  discussions with either the District Attorney's Office, county

11  detectives or state police in this matter regarding the

12  specific area of the crime scene?

13  A    Did you say conversations also?

14      Q    Yes.

15  A    It was my recollection that in discussing this particular

16  subject with Trooper Jim Henry, who is the prosecutor, that

17  they in fact also did not know where the crime ultimately

18  occurred.  The crime of rape, et cetera.

19      Q    In your capacity as Mr. Mason's defense attorney,

20  did you ask any investigator from your office to attempt to

21  locate the crime scene where the rape took place?

22  A    No.

23      Q    Now, there came a time following the trial and

24  dictation of the post-verdict motions when you ceased to be

25  Mr. Mason's attorney and a member of the Public Defender's

1  Office?

2  A    That's correct.

3      Q    How soon after you left the Public Defender's Office

4  did you become affiliated with the District Attorney's Office?

5  A    Well, I guess that would have occurred instantaneously.

6  Upon being sworn into the District Attorney's Office, I was no

7  longer a member of the Public Defender's Office.

8      Q    Was there any restrictions by way of a time frame or

9  hiatus placed on you by the District Attorney's Office as to

10  when you could commence your duties as a district attorney

11  because of your affiliation with the Public Defender's Office

12  in the past?

13  A    It was understood that I would not work on any cases as

14  an assistant district attorney with which I had involvement as

15  an assistant public defender.

16      Q    Did you have any conversations with any district

17  attorney or detective or anyone associated with the Jerry

18  Mason prosecution?

19  A    Subsequent to becoming an --

20      Q    A district attorney?

21  A    Not at all.  If his name came up I wouldn't say a thing

22  or would leave the room or whatever.

23          MR. FANNICK:    No further questions.

24          MS. McGRANE:    Your Honor, may I approach the

25  witness?

1          THE COURT:      You don't have to ask.   Thank you.

2                          - - -

3   REDIRECT EXAMINATION

4   BY MS. McGRANE:

5       Q    I'm showing you a copy of your request for your bill

6   of particulars.   Was that filed by you?

7   A    Yes, it was.

8       Q    And in that request for bill of particulars, is the

9   place of the alleged offense requested?

10  A    Paragraph five (a) requests the exact place of the

11  alleged offense.

12          MS. McGRANE:    I have nothing further, Your Honor.

13                          - - -

14  RECROSS-EXAMINATION

15  BY MR. FANNICK:

16      Q    Mr. Marsilio, you requested the exact location of

17  the offense because you considered it an important element in

18  preparing Mr. Mason's defense, isn't that true?

19  A    I wouldn't use those words exactly.

20      Q    Did you make the request because Mr. Mason

21  had discussions with you regarding the investigation or

22  whereabouts of the actual crime scene?

23  A    As I testified earlier, I don't remember discussing this

24  specific issue with the Defendant.

25      Q    Did you make the request because it was your

1   intention that if the crime scene was actually identified to

2   you, that either you personally or some investigator from your

3   office would in fact go there and examine the scene?

4   A     If it were identified, certainly we would have done that.

5         Q     Why would you have done that?

6   A     In order to become more familiar with the area.  In order

7   to provide as best a defense as I could, wherein the Defendant

8   is concerned.

9              MR. FANNICK:      No other questions.

10             THE COURT:        Anything further?

11             MS. McGRANE:      No, Your Honor.

12             THE COURT:        You may step down.

13             MS. McGRANE:      Commonwealth calls Attorney Cowley.

14             MR. MARSILIO:     Judge, may I be excused?

15             THE COURT:        You need Mr. Marsilio?

16             MR. FANNICK:      No.

17             THE COURT:        You may be excused.

18                               - - -

19        VIRGINIA MURTHA-COWLEY, called as a witness on behalf of

20        the Commonwealth, being duly sworn, testified as follows:

21                               - - -

22   DIRECT EXAMINATION

23   BY MS. McGRANE:

24        Q     Attorney Cowley, were you employed as an assistant

25   district attorney?

1    A    Yes, I was.

2         Q    And in your capacity as an assistant district

3    attorney, were you involved in the case of Commonwealth versus

4    Jerry Mason?

5    A    Yes.  I handled the preliminary hearing and some motions

6    prior to -- or immediately after the hearing.

7         Q    And when did you leave the DA's office?

8    A    I left in January of 1988.

9         Q    And then where were you employed?

10   A    At the Public Defender's Office in Luzerne County.

11        Q    When did you begin working there?

12   A    I don't remember the exact date.  It would have been very

13   early on in January of 1988.

14        Q    And did you, in your capacity as a public defender,

15   come into contact with Jerry Mason.

16   A    Yes, I did.

17        Q    And did you have an opportunity to speak with him

18   about this case?

19   A    Yes, I did.

20        Q    And did you represent Jerry Mason?

21   A    Yes, I did.  What happened was, to clarify the situation

22   for the Court, when Mr. Marsilio left the Public Defender's

23   Office and I joined the Public Defender's Office, in essence

24   took over his case load.  It was easier for the chief public

25   defender to assign my duties in that manner.  And I took over

1    his case load.  At that time I believe we were entering into

2    the post trial phase of the case.

3        Q    And what did your involvement in the case entail?

4    A    I wrote the brief.  I talked to Mr. Mason because it was

5    admittedly a very uncomfortable situation.  I had done the

6    preliminary hearing.  I spoke with Mr. Mason at length about

7    my having done the preliminary hearing and now representing

8    him.  His concern, as he voiced to the Court, was that he was

9    -- did not believe that I thought he was innocent.  And I told

10   Mr. Mason what I tell all my clients:  It's not my job to

11   determine their guilt or their innocence, it's my job to

12   represent them.  It's someone else's job, the jury's job, or

13   the judge's job, to make a determination as to guilt or

14   innocence.

15        I told him that I would try to represent him as best as I

16   can.  I also told him, to be frank with the Court, that I

17   would check with my superiors to see if someone else could be

18   assigned if it would make him feel more comfortable.  However,

19   the chief public defender made the determination that at this

20   point I would remain on the case or at that point I would

21   remain on the case.  And again, I did talk to Mr. Mason about

22   it, and my understanding was that we had resolved the issue at

23   least as to that case and that -- the post-trial motions.  We

24   had discussed it at length and that it had been resolved.  And

25   I had indicated to him there's no knowledge that I have that

1    he didn't already have.  Having represented the Commonwealth

2    at the preliminary hearing, he already knew everything that I

3    knew.  I didn't know anything more than that.  I wasn't

4    holding anything back from him and I felt that technically

5    there was no conflict and I was able to do it.  However,

6    admittedly it was an uncomfortable situation.

7        Q    Did your work in the DA's office in any way

8    adversely affect your representation of Mr. Mason for the

9    brief?

10   A    No.

11       Q    And did he ever indicate that he did not want you to

12   file that brief on his behalf?

13   A    No.

14       Q    Did you have an opportunity to adequately discuss

15   the matters in the brief with Mr. Mason?

16   A    Yes.

17       Q    And the matters that you discussed were in fact

18   included in the brief?

19   A    Yes.

20            MS. McGRANE:    I have nothing further, Your Honor.

21            THE COURT:     Cross.

22   CROSS-EXAMINATION

23   BY MR. FANNICK:

24       Q    First, I apologize, I referred to you earlier as

25   Attorney Murtha.  And I only did that because that's how my

1    client knows you?

2    A    That's fine.

3        Q    I'm just confused, and for clarification purposes,

4    who filed the petition testified to by Mr. Mason with Judge

5    Hourigan regarding the conflict?  Do you know?

6    A    I really don't remember.  I remember after Mr. Mason

7    mentioned it in court I recalled the hearing but I really

8    don't remember who filed it.

9        Q    Do you recall if the hearing, or whatever proceeding

10   there was before Judge Hourigan, occurred before or after the

11   brief which you have prepared was filed?

12   A    I think it was after.  I think, I'm not sure.

13       Q    And it was decided at that proceeding that the

14   better course of proceeding in the matter was to assign a

15   conflict counsel to represent Mr. Mason?

16   A    Yes.

17       Q    And from that point you had no further contact with

18   Mr. Mason regarding the case?

19   A    No.

20       Q    Did the information you obtained regarding this

21   matter as a member of the District Attorney's Office in any wa

22   affect your representation of Mr. Mason as his

23   defense lawyer?

24   A    No.  In fact, it gave me a very clear understanding of

25   the facts.  I think I knew the case more than I probably woul

1  have if I just assumed it without knowing anything prior about

2  it.

3      Q    Did you in any way participate in the preparation of

4  the Mason case for the jury trial during March and early April

5  of 1988?

6  A    No.

7      Q    Just so the record is straight, I'm asking that

8  question, whether you participated as a member of the district

9  attorney staff, because you were still employed by the office

10  at that time, correct?

11  A    No, I was not.  January --

12      Q    No, I'm saying March 28th through April 4th, the

13  time that Mr. Mason's jury trial took place?

14  A    Was that in 1988?

15      Q    Yes.

16  A    I believe I was A public defender at that time.  I

17  believe.  January of 1988 -- I was a DA from '86 and '87.  In

18  January of '88 I became a public defender.

19      Q    But Mr. Marsilio was still representing Mr. Mason at

20  that time.  Were you both in the same office at the same time?

21  A    I don't recall ever having any discussion -- I really

22  don't remember how, because I was surprised when Mr. Marsilio

23  said it was May of '88 that he changed offices.  I really

24  don't recall that.  In my capacity as a public defender we

25  were both part-time.  I had a totally different district than

COLLOQUY                                                                    40

1    Mr. Marsilio did, so I really didn't see him.

2           MR. FANNICK:    No other questions.

3           THE COURT:    Anything further?

4           MS. McGRANE:    I have no further questions.

5           THE COURT:    You may step down.  Watch your step

6    getting down.

7           MS. McGRANE:    Your Honor, may we approach?

8           MS. COWLEY:    May I be excused?

9           THE COURT:    You need Ms. Cowley?

10          MR. FANNICK:    No.

11          THE COURT:    Fine.

12                          - - -

13   (Whereupon, a discussion took place which was off the

14   record.)

15                          - - -

16          THE COURT:    Anything further from the

17   Commonwealth?

18          MS. McGRANE:    No, Your Honor.

19          THE COURT:    Anything further?

20          MR. FANNICK:    No.

21          Quite honestly, Your Honor, I think the only thing

22   that I would like to present is perhaps a short brief on

23   the issue of this potential conflict based upon the

24   testimony that we've heard today.

25          THE COURT:    How long do you want for the brief?

1          MR. FANNICK:    Two weeks, maybe.

2          THE COURT:      All right.  And two weeks after you

3    respond.

4          You may have an issue that possess a problem so

5    we'll give you more time.  When will you be ready?

6          MR. FANNICK:    Maybe two weeks when she comes back.

7          MS. McGRANE:    September 10th.

8          THE COURT:      That's fine.

9          Anything further?

10         MR. FANNICK:    No, Your Honor.  The only thing I

11   would want to place on the record as a side note, Mr.

12   Mason indicated during his testimony that he had made

13   numerous requests from all sorts of attorneys

14   representing him to obtain the transcript.  I have the

15   transcript in my possession now.  It's my understand that

16   if I were to give it to him today, getting it into the

17   prison the proper way would be to send it to him.  So I

18   will represent on the record that I will send him copies.

19         THE COURT:      The record will indicate that.

20   You'll get a transcript of the proceedings from the

21   beginning to the end of the trial.  Included in that I

22   don't know if the appellate opinions --

23         MR. FANNICK:    What I have, Your Honor, is the

24   pretrial proceeding, the trial proceeding, the sentencing

25   and modification hearings.

COLLOQUY                                                          42

1            THE COURT:      Fine.   Thank you all for being here.

2                              - - -

3         (Whereupon, the hearing was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JERRY MASON, | : | |
|     *Petitioner* | : | Civil No. 1:00-CV-1490 |
|     v. | : | |
| | : | (Judge Rambo) |
| ROBERT W. MEYERS, | : | |
| Superintendent, | : | (Magistrate Judge Smyser) |
|     *Respondent* | : | |

## STATEMENT OF RICHARD S. GARVEY

AND NOW comes Richard S. Garvey, Federal Public Defender Investigator, who swears that the following is true and correct to the best of his information and belief:

1.   I, Richard S. Garvey, have been an investigator for the Federal Public Defender's Office for the past six years.

2.   On May 9, 2001, I was assigned to conduct an investigation in the case of Mason v. Meyers.

3.   On May 14, 2001, I spoke by telephone with Mr. Mark Metzo of White Haven, Pennsylvania.

4.      I identified myself as the Federal Public Defender Investigator and explained to Mr. Metzo that I was investigating facts regarding Jerry Mason's conviction.

5.      I asked Mr. Metzo if he had any information which pertained to the Mason prosecution.

6.      Mr. Metzo indicated that he is currently employed by the Commonwealth of Pennsylvania in the Department of Forestry.

7.      Mr. Metzo indicated that in 1987, he was employed as a part-time police officer for the White Haven Police Department.

8.      Mr. Metzo stated to me that he was present at the White Haven Police Department on the night the assault in the above-captioned case was reported.

9.      Mr. Metzo told me that he was present when Officer Robert Searfoss received a phone call from the woman who was reporting the assault, and that he overheard Officer Searfoss's end of the conversation.

10.     Mr. Metzo told me that he heard Officer Searfoss tell the victim, "that sounds like Jerry Mason."


Pursuant to 28 U.S.C. § 1784, I affirm under penalty of perjury that the above is true and correct to the best of my information and belief.


Date:    _____8/7/01_____        _____R.D S. Aug_____
                                Richard S. Garvey
                                Investigator
                                Federal Public Defender's Office
                                Middle District of Pennsylvania

# CERTIFICATE OF SERVICE

I, Daniel I. Siegel, of the Federal Public Defender's Office do hereby certify that on this date I served a copy of the foregoing **EXHIBITS TO BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS** by placing the same in the United States mail, first class, in Harrisburg, Pennsylvania, addressed to the following:

> Frank P. Barletta, Esquire
> Assistant District Attorney
> Luzerne County Courthouse
> 200 North River Street
> Wilkes-Barre, PA 18711

> Jerry Mason
> Inmate No. BK-6012
> SCI Rockview
> PO Box A
> Bellefonte, PA 16823

Date: _Aug. 7, 2001_

_Daniel I. Siegel_
DANIEL I. SIEGEL, ESQUIRE
Asst. Federal Public Defender
Attorney for Jerry Mason